# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

| | |
|---|---|
| JONATHAN GAIMAN, Derivatively on Behalf of Nominal Defendant DRIVEN BRANDS HOLDINGS INC., ) ) ) | |
| ) Case No. _____ | |
| Plaintiff, ) | |
| ) **JURY TRIAL DEMANDED** | |
| v. ) | |
| ) | |
| JONATHAN G. FITZPATRICK, TIFFANY L. MASON, NEAL ARONSON, CATHERINE HALLIGAN, CHADWICK HUME, RICK PUCKETT, KAREN STROUP, PETER SWINBURN, MICHAEL THOMPSON, and JOSE TOMÁS, ) ) ) ) ) ) | |
| ) | |
| Defendants, ) | |
| ) | |
| and ) | |
| ) | |
| DRIVEN BRANDS HOLDINGS INC., ) | |
| ) | |
| Nominal Defendant. ) | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Jonathan Gaiman ("Plaintiff"), by and through his undersigned attorneys, brings this verified stockholder derivative action on behalf of nominal defendant Driven Brands Holdings Inc. ("Driven" or the "Company"), against certain of the Company's executive officers and its board of directors (the "Board") for breaches of fiduciary duties and violations of federal law by the Individual Defendants (defined below). Plaintiff's allegations are based on personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based on, *inter alia*, the investigation conducted by his counsel, including review of publicly available information regarding the Company; the allegations of a securities class action complaint filed in *Genesee County Employees' Retirement System v. Driven Brands*

*Holdings Inc. et al.,* Case No. 3:23-cv-00895-MOC-DCK (W.D.N.C. Dec. 22, 2023); (the "Securities Class Action"); conference call transcripts and announcements; filings with the United States Securities and Exchange Commission (the "SEC"); press releases disseminated by Driven; legal filings; news reports; and securities analysts' reports about the Company.

## NATURE OF THE ACTION

1.      This shareholder derivative action is brought on behalf of Driven against certain officers and members of the Company's Board for breaches of their fiduciary duties between at least October 27, 2021 and August 1, 2023, inclusive (the "Relevant Period") and violations of federal securities laws, caused by the issuance of materially false and misleading statements issued, or caused to be issued, by the Individual Defendants in the Company's SEC filings and other public statements. The Individual Defendants' wrongdoing has exposed the Company to massive potential liability to the class, as well as the significant defense costs in the Securities Class Action, as set forth below.

2.      Driven is an automotive services company that primarily focuses on automotive repair and maintenance services.

3.      Prior to and during the Relevant Period, the Company's growth model centered around acquiring smaller businesses in the automotive care industry and integrating them into Driven's existing operations.

4.      Investors relied on the Individual Defendants' repeated representations, touting Driven's "proven track record" of successfully integrating smaller businesses.

5.      The Company attributed its success in acquiring and integrating smaller businesses to its "bolt-on" and "tuck-in" strategy. The strategy involved purchasing a "base" or "platform" business in one of the Company's automotive segments, like car wash or auto glass, and then

"bolting-on" smaller businesses, incorporating them into the established platform.

6.    In October 2021, the Company announced a strategy to generate substantial revenue growth and bring earnings before interest, taxes, depreciation, and amortization ("EBITDA") from just over $350 million to at least $850 million by 2026. The strategy involved acquiring a network of auto glass businesses across the country and driving sales and customer retention in the Company's purportedly stable car wash business.

7.    In January 2022, pursuant to this growth strategy, Driven announced that it would be expanding into the "approximately $5 billion and growing" U.S. auto glass market. Pursuant to the Company's "bolt-on" strategy, Driven acquired Auto Glass Now ("AGN") as its "base," representing to investors that it planned to "leverage [its] growth blueprint" quickly to acquire "a robust pipeline" of smaller auto glass providers across the country, incorporating them into the Company's AGN "base" to "significantly accelerate [its] presence in this segment."

8.    In addition to Driven's expansion into the auto glass industry, the Company's growth strategy involved its purportedly stable car wash segment contributing steady growth. The performance of Driven's car wash segment was critical to the Company's overall success. Indeed, at the start of the Relevant Period, Driven's car wash business accounted for more than 10% of its revenue and more than 30% of its earnings.

9.    As former employees, interviewed by plaintiffs' counsel in the Securities Class Action, have confirmed, the Company faced obstacles integrating auto glass companies into its operations. Specifically, each glass business in Driven's acquisition pipeline operated under a different business model and involved different revenue streams.

10.    As a result, establishing and maintaining an effective point of sale ("POS") system, a centralized database used to compile and store revenue data from each of its acquired companies,

was critical for the successful integration of any new companies. Driven ran its POS system through the AGN platform.

11. Throughout the Relevant Period, the Individual Defendants issued statements that were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) the car wash business segment was suffering from widespread equipment failures and poor service; (ii) the Company failed to adequately invest in service, equipment, and maintenance in its car wash business, which significantly impaired the segment's operating capacity; (iii) as a result of the foregoing, the car wash business segment was experiencing substantial customer loss, competitive intrusion, and declining same-store sales.

12. Further, with respect to the Company's auto glass segment, the Individual Defendants issued statements that were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) the Company failed to establish and maintain an effective POS system to report and store data across the Company's auto glass segment; (ii) these data issues caused substantial delays in the Company's integration timeline; (iii) the Company would be forced to undergo a complete overhaul of AGN's POS system; (iv) as a result of these issues, several of Driven's acquired businesses could not effectively communicate with the AGN platform; (v) this adversely impacted Driven's ability to service key customers; and (vi) as a result of the foregoing, the Company's revenue growth was stifled by customer loss and integration delays in its auto glass business segment.

13. After a series of partially corrective disclosures beginning in October 2022, the truth fully emerged on August 2, 2023, when the Company revealed during an earnings call that

its integrations in the auto glass business segment were "several quarters behind" and were "not going as quickly as planned." As a result, in order to "get the integration completed," the Company would substantially decrease the scope of its glass acquisition campaign and reduce its new glass unit store growth for 2023 from 130 to 90.

14.     With respect to the Company's car wash business segment, Driven announced a 4% year-over-year same-store sales decline, attributable to "significant competitive . . . growth" over the prior two years and admitting that Driven was losing substantial numbers of customers to these competitors.

15.     On this news, the price of Driven stock declined roughly 41%, from a close of $25.83 per share on August 1, 2023 to close at $15.20 per share on August 2, 2023.

16.     As a direct and proximate result of the misconduct detailed herein, the Company has incurred significant financial losses, including the cost of defending itself and, potentially, incurring class-wide damages in the Securities Class Action, as well as additional losses in market capitalization, reputational harm and the loss of goodwill.

17.     Moreover, in light of the breaches of fiduciary duty by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the Securities Class Action, and that the Individual Defendants are beholden to each other based on their longstanding business and personal relationships, the Individual Defendants do not possess the requisite level of disinterestedness and independence to consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") as the claims asserted herein arise under Sections 14(a), 10(b), and 21D of the Exchange Act.

19.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

20.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

21.     Additionally, diversity jurisdiction is conferred pursuant to 28 U.S.C. § 1332 as there is complete diversity between the Plaintiff and the Defendants. Plaintiff and Defendants are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

22.     Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. §1391(b)(1), as Driven maintains its principal executive offices in this District and a substantial portion of the acts and omissions alleged herein, including the issuance and dissemination of materially false and misleading information, occurred in this District.

## PARTIES

*Plaintiff*

23.     Plaintiff is, and has been at all relevant times, a shareholder of Driven. Plaintiff is a citizen of New York.

*Nominal Defendant*

24.     Nominal Defendant Driven is incorporated under the laws of the State of Delaware.

25.     The Company's principal executive offices are located at 440 South Church Street,

Suite 700, Charlotte, North Carolina, 28202. Driven's common stock trades on the Nasdaq Stock Market ("NASDAQ") under the ticker symbol "DRVN."

***Individual Defendants***

26.     Defendant Jonathan G. Fitzpatrick ("Fitzpatrick") served as Driven's President and Chief Executive Officer ("CEO") from July 2012 until May 9, 2025 and has served as a member of the Board since April 2018. Defendant Fitzpatrick is named as a defendant in the Securities Class Action. According to the Company's public filings, Defendant Fitzpatrick received $14,837,267 in 2021 and $6,805,461 in 2022 in compensation from the Company. As of April 7, 2025, Defendant Fitzpatrick beneficially owned 4,007,460 shares of Driven common stock, worth roughly $62 million[1] and constituting 2.4% of the Company's total outstanding shares. Upon information and belief, Defendant Fitzpatrick is a citizen of Florida.

27.     Defendant Neal Aronson ("Aronson") has served as Chair of the Board since January 2021 and as a member of the Board since December 2020. On September 15, 2022, while the price of Driven stock was artificially inflated due to the false and misleading statements detailed herein, Defendant Aronson sold 7,000,000 shares of personal holdings of Company stock at an average price of $32.19, reaping $225,329,999 in proceeds. Upon information and belief, Defendant Aronson is a citizen of Georgia.

28.     Defendant Catherine Halligan ("Halligan") has served as a member of the Board since December 2020 and serves as Chair of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. According to the Company's public filings, Defendant Halligan received $213,001 in 2022 in compensation from the Company. As of April

---

[1] Valuations of the Individual Defendants' personal holdings of Company stock are calculated based on the $15.43 per share closing price of Driven common stock on April 7, 2025.

7, 2025, Defendant Halligan beneficially owned 35,973 shares of Driven common stock, worth $555,063. Upon information and belief, Defendant Halligan is a citizen of California.

29.     Defendant Chadwick Hume ("Hume") has served as a member of the Board since December 2020. Upon information and belief, Defendant Hume is a citizen of Georgia.

30.     Defendant Rick Puckett ("Puckett") has served as a member of the Board since December 2020 and serves as Chair of the Audit Committee. According to the Company's public filings, Defendant Puckett received $215,001 in 2022 in compensation from the Company. As of April 7, 2025, Defendant Puckett beneficially owned 180,117 shares of Driven common stock, worth roughly $2.8 million. Upon information and belief, Defendant Puckett is a citizen of North Carolina.

31.     Defendant Karen Stroup ("Stroup") has served as a member of the Board since December 2020 and serves as a member of the Audit Committee and the Compensation Committee. According to the Company's public filings, Defendant Stroup received $204,001 in 2022 in compensation from the Company. As of April 7, 2025, Defendant Stroup beneficially owned 42,815 shares of Driven common stock, worth $660,635. Upon information and belief, Defendant Stroup is a citizen of Texas.

32.     Defendant Peter Swinburn ("Swinburn") has served as a member of the Board since December 2020 and serves as Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee. According to the Company's public filings, Defendant Swinburn received $215,001 in 2022 in compensation from the Company. As of April 7, 2025, Defendant Swinburn beneficially owned 259,864 shares of Driven common stock, worth roughly $4 million. Upon information and belief, Defendant Swinburn is a citizen of Florida.

33.     Defendant Michael Thompson ("Thompson") has served as a member of the Board

since December 2020. Upon information and belief, Defendant Thompson is a citizen of Georgia.

34. Defendant Jose Tomás ("Tomás") has served as a member of the Board since July 2022 and serves as a member of the Compensation Committee and the Nominating and Corporate Governance Committee. According to the Company's public filings, Defendant Tomás received $159,508 in 2022 in compensation from the Company. As of April 7, 2025, Defendant Tomás beneficially owned 19,508 shares of Driven common stock, worth $301,008. Upon information and belief, Defendant Tomás is a citizen of Florida.

***Officer Defendant***

35. Defendant Tiffany L. Mason ("Mason") served as Driven's Executive Vice President and Chief Financial Officer ("CFO") from March 2020 until her termination on May 4, 2023. Defendant Mason is named as a defendant in the Securities Class Action. According to the Company's public filings, Defendant Mason received $4,862,581 in 2021 and $2,233,000 in 2022 in compensation from the Company. Upon information and belief, Defendant Mason is a citizen of North Carolina.

***Relevant Non-Parties***

36. This action is based on Plaintiff's review, by counsel, of an extensive record of public documents as well as the Amended Class Action Complaint (the "Amended Complaint") in the Securities Class Action which contains detailed allegations based on interviews with former Driven employees (referred to herein as FEs 1-5) who provided information to plaintiffs' counsel in the Securities Class Action supporting the allegations in that case. These former employees provided information on a confidential basis and were described in the Amended Complaint with sufficient detail to establish their reliability and personal knowledge.

37. FE 1 worked as a senior executive in Driven's auto glass business from shortly after

9

the AGN acquisition until mid-2023. In that role, FE 1 was primarily responsible for oversight over the Company's integrations of acquired auto glass companies.

38. FE 2 worked as a district manager and regional manager at AGN from prior to Driven's acquisition of AGN until after the end of the Relevant Period.

39. FE 3 worked as a Regional Sales Manager for AGN from June to September 2023. In that role, FE 3 was primarily responsible for oversight over sales at roughly 50 locations across New York, New Jersey, and Pennsylvania.

40. FE 4 worked as a Vice President in Driven's car was segment from April 2022 until May 2023. In that role, FE 4 was primarily responsible for oversight over the Company's car wash business segment national operations.

41. FE 5 worked as a Vice President in Driven's car wash segment from prior to the start of the Relevant Period until early 2022. In that role, FE 5 was primarily responsible for oversight over facilities and maintenance operations nationally for the Company's car wash business.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

42. Because of their positions as officers and/or directors of Driven, and their ability to control the business and corporate affairs of the Company, the Individual Defendants owed Driven and its shareholders fiduciary obligations of good faith, loyalty, trust, and candor and were required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner at all relevant times.

43. Therefore, the Individual Defendants were required to act in furtherance of the best interests of Driven and its shareholders.

44. Each director and officer of the Company owes to Driven and its shareholders the

fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

45. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Driven, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

46. Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of trust, loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Driven, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

47. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, earnings, internal controls, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding Driven's underinvestment in equipment and maintenance in its car wash business segment and integration issues in the Company's auto glass business segment, and the Individual Defendants had a duty to cause the Company to disclose in its regulatory filings with the SEC all

those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

48.     To discharge their duties, the officers and directors of Driven were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Driven were required to, among other things:

(a)     Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Driven's own Code of Conduct and Ethics (the "Code of Conduct");

(b)     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(c)     Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion;

(d)     Remain informed as to how Driven conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(e)     Establish and maintain systematic and accurate records and reports of the business and internal affairs of Driven and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(f)     Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Driven's operations would comply with all applicable laws and Driven's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(g)     Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(h)     Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above; and

(i)     When put on notice of problems with the Company's business practices, operations, or internal controls, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

49.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Driven.

50.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Driven and were at all times acting within the course and scope of such agency.

51.     Each of the Individual Defendants breached his or her fiduciary duties as alleged herein, both individually and in concert with the other Defendants.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

52.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

53.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

54.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company, purposefully, recklessly, or negligently, to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

55.     In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Driven, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

56.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

57. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Driven and at all times acted within the course and scope of such agency.

## DRIVEN'S CODE OF CONDUCT

58. Driven's Code of Conduct begins with a commitment to the "highest standards of professional and ethical conduct" and highlights Driven's "reputation for honesty, integrity and accountability."

59. The Code of Conduct applies to "all employees, officers and directors," and violations of the Code of Conduct will lead to "disciplinary action, up to and including termination of employment."

60. The Code of Conduct states that "it is imperative that our business practices comply with the laws of all of the jurisdictions in which we operate. No employee, officer or director may achieve results through violations of laws or regulations or unscrupulous dealings."

61. In a section titled "Conflicts of Interest," the Code of Conduct states, in pertinent part:

> You must avoid any relationship or activity that could affect your independent judgment in the conduct of Company business or conflicts with or could reasonably give the appearance of conflicting with Company interests. In assessing whether a situation poses a conflict of interest, the Company will examine whether your interest or activity could influence, or could give the appearance of influencing, your decisions on behalf of the Company.

62. In a section titled "Public Reporting," the Code of Conduct states:

> Full, fair, accurate and timely disclosure must be made in the reports and other documents that the Company files with, or submits to, the SEC and in its other public communications. Such disclosure is critical to ensure that the Company maintains its good reputation, complies with its obligations under the securities laws and meets the expectations of its stockholders.
>
> Persons responsible for the preparation of such documents and reports and other

public communications must exercise the highest standard of care in accordance with the following guidelines:

- all accounting records, and the reports produced from such records, must comply with all applicable laws;

- all accounting records must fairly and accurately reflect the transactions or occurrences to which they relate;

- all accounting records must fairly and accurately reflect in reasonable detail the Company's assets, liabilities, revenues and expenses;

- accounting records must not contain any false or intentionally misleading entries;

- no transactions should be intentionally misclassified as to accounts, departments or accounting periods;

- all transactions must be supported by accurate documentation in reasonable detail and recorded in the proper account and in the proper accounting period;

- no information should be concealed from the internal audit department or the independent registered public accounting firm; and

- compliance with the Company's internal control over financial reporting and disclosure controls and procedures is required.

63.     In a section titled "Protection and Proper Use of Company Assets," the Code of Conduct states, in pertinent part, that "[a]ll employees, officers and directors should promote and ensure the efficient and responsible use of the Company's assets and resources by the Company. Theft, carelessness and waste have a direct impact on the Company's profitability."

64.     In a section titled "Insider Trading," the Code of Conduct states:

Insider trading is unethical and illegal. Employees, officers and directors must not trade in securities of a company while in possession of material non-public information regarding that company. It is also illegal to "tip" or pass on inside information to any other person who might make an investment decision based on that information or pass the information to third parties. The Company has a Securities Trading Policy, which sets forth obligations in respect of trading in the Company's securities.

65.     In a section titled "Fair Dealing," the Code of Conduct states:

Each employee, officer and director, in carrying out his or her duties and responsibilities, should endeavor to deal fairly with each other and the Company's customers, suppliers and competitors. No employee, officer or director should take unfair advantage of anyone through illegal conduct, manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair-dealing practice.

66.     In a section titled "Compliance with Laws, Rules and Regulations," the Code of Conduct states:

Compliance with both the letter and spirit of all laws, rules and regulations applicable to the Company, including any securities exchange or other organization or body that regulates the Company, is critical to our reputation and continued success. All employees, officers and directors must respect and obey the laws of the cities, states and countries in which the Company operates and avoid even the appearance of impropriety. Employees, officers or directors who fail to comply with this Code and applicable laws will be subject to disciplinary measures, up to and including discharge from the Company.

## DRIVEN'S AUDIT COMMITTEE CHARTER

67.     Driven's Audit Committee Charter states that the purpose of the Audit Committee is to:

[P]rovide assistance to the Board in fulfilling its legal and fiduciary obligations with respect to matters involving the accounting, auditing, financial reporting, internal control, risk management and legal compliance functions of the Company. This includes, without limitation, (a) assisting the Board with its oversight of (i) the accounting and financial reporting processes and internal controls of the Company and its subsidiaries, including the audits of the Company's financial statements and the integrity of the Company's financial statements, (ii) the Company's compliance with legal and regulatory requirements, (iii) the Company's independent registered public accounting firm's qualifications and independence and (iv) the performance of the Company's independent registered public accounting firm and the Company's internal audit function, and (b) preparing the report required to be prepared by the Committee pursuant to the rules of the Securities and Exchange Commission (the "SEC") for inclusion in the Company's annual proxy statement.

68.     The Audit Committee Charter states that the Audit Committee shall "[o]btain and review at least annually the Company's control environment, risk assessment, internal audit plan,

and internal audit budget."

69.     With respect to the Company's public disclosures, the Audit Committee Charter

tasks the Audit Committee with the following responsibilities:

- Review and discuss with management and the Company's independent registered public accounting firm the Company's annual audited financial statements and related disclosures under the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section , prior to including within the Company's Annual Report on Form 10-K;

- Recommend to the Board whether the Company's annual audited financial statements should be included in the Company's annual report on Form 10-K for filing with the SEC and timely prepare an audit committee report required by the SEC to be included in the Company's annual proxy statement;

- Review and discuss with management and the Company's independent registered public accounting firm, the Company's quarterly financial statements and related disclosures under the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section and the results of the Company's independent registered public accounting firm's review of the quarterly financial statements prior to including within the Company's Quarterly Reports on Form 10-Q;

- Review the Company's quarterly earnings press releases (especially the use of "pro forma" or "adjusted" information for compliance with generally accepted accounting principles), as well as financial information and earnings guidance provided by the Company to analysts and rating agencies. This will generally be before the scheduled releases and such discussions may be general consisting of discussing the types of information to be disclosed and the types of presentations to be made;

70.     With respect to the Company's internal controls, the Audit Committee Charter

states that the Audit Committee shall:

Review with the chief executive officer and chief financial officer and Company's independent registered public accounting firm, quarterly, the following:

- All significant deficiencies in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize, and report financial data, including any material weaknesses in internal controls identified by the Company's management, internal audit or independent registered public accounting firm.

18

71.     The Audit Committee Charter further states that the Audit Committee shall:

Review the internal control report prepared by management, including (i) management's assessment of the effectiveness of the Company's internal control over financial reporting and the Company's independent registered public accounting firm's attestation, and report, on the assessment made by management, in each case, as required by Section 404 of the Sarbanes-Oxley Act of 2002 and (ii) any significant changes in internal control over financial reporting disclosed or considered for disclosure in periodic filings with the SEC as required by the certifications required under Section 302 of the Sarbanes-Oxley Act of 2002, including any corrective actions with regard to significant deficiencies and material weaknesses.

72.     With respect to the Company's disclosure controls, the Audit Committee Charter states that the Audit Committee shall "[r]eceive reports from management regarding, and review and discuss the adequacy and effectiveness of the Company's disclosure controls and procedures."

73.     With respect to the Company's risk oversight and risk management functions, the Audit Committee Charter states that the Audit Committee shall:

Discuss and oversee policies governing the process by which senior management of the Company assess and manage the Company's risk exposure. Including the following:

- management's identification, monitoring and evaluation of the Company's major financial and other risk exposures including operational, legal, regulatory, business, commodity, major project, strategic, credit, liquidity, derivative, reputation and external risks;

- the development of the Company's enterprise risk management policies and procedures including limits and tolerances, risk roles and responsibilities, risk mitigation decisions and risk related assumptions;

- implementation of policies and procedures ensuring the Company's risks are identified and that controls are adequate, in place and functioning properly;

- review the Company's fraud risk assessment program and controls to mitigate fraud; and

- report regularly to the Board on the Company's enterprise risk management program;

74.     With respect to the Company's Code of Conduct, the Audit Committee Charter states that the Audit Committee shall:

> Review the Company's compliance and ethics programs, including the Company's Code of Conduct and Ethics, and meet quarterly with the Company's general counsel to discuss compliance with the Code of Conduct and Ethics, ensure management makes the Code of Conduct and Ethics available to employees and understand completion of annual/periodic training/certification across employee groups.

## SUBSTANTIVE ALLEGATIONS

### *Background*

75.     In the Company's public filings, Driven describes itself as "the largest automotive services company in North America with a growing and highly-franchised base of approximately 5,000 locations across 49 U.S. states and 13 other countries." Throughout the Relevant Period, Driven emphasized that the automotive care industry was "large, recession-resistant, and highly-fragmented."

76.     Prior to and during the Relevant Period, the Company's growth model centered around acquiring smaller businesses in the "highly-fragmented automotive care industry," and integrating them into Driven's existing operating structure. In a prospectus, filed with the SEC in connection with the Company's January 2021 IPO (the "IPO Prospectus"), Driven stated:

> [W]e have a proven track record of executing tuck-in acquisitions of independent market participants that are highly value accretive when integrated into our platform based on our ability to drive performance improvement post-acquisition through upfront cost synergies as well as incremental revenue growth opportunities from Driven's platform and economies of scale.

77.     The Company further represented that incorporating these businesses into a single "highly-recognized" brand would allow Driven to provide "exceptional in-store execution," "generat[ing] . . . strong brand loyalty from our customers," and to "driv[e] consistent same store

sales growth." The IPO Prospectus highlighted the Company's "historical success in driving revenue and profit growth," including "twelve consecutive years of positive same store sales growth through 2019, including growth through the Great Recession."

78.     The IPO Prospectus explained that "M&A is a core competency of the Driven Brands platform. We have invested in and built out a dedicated team and supporting infrastructure and processes to systematically source, diligence, acquire and integrate acquisitions." The Individual Defendants additionally touted the Company's "continued ability to pursue and execute upon scalable and highly strategic M&A as well as integrating large businesses into the Driven Brands platform," its "proven track record" of successfully integrating smaller businesses, and its "ability to pursue and execute upon scalable and highly strategic M&A." The Individual Defendants represented that acquisitions would continue to be a crucial element of the Company's growth strategy, stating that Driven's "track-record of highly-accretive M&A, with acquired companies benefiting from rapid growth and immediate synergies, will continue to be a significant part of the growth story for Driven Brands."

79.     The Company attributed its success in acquiring and integrating smaller businesses to its "bolt-on" and "tuck-in" strategy. The strategy involved purchasing a "base" or "platform" business in one of the Company's automotive segments, like car wash or auto glass, and then "bolting-on" smaller businesses, incorporating them into the established platform. Throughout the Relevant Period, the Individual Defendants touted Driven's "bolt-on acquisition machine" as "a consistent and repeatable M&A strategy, having completed more than 40 acquisitions since 2015." The Individual Defendants further explained that Driven's bolt-on strategy gave the Company a competitive advantage in successfully integrating businesses:

> Once a company has been acquired, we leverage our shared services to enable the acquired business to benefit from our powerful procurement programs, data

analytics capabilities, and training services. Every acquisition has been integrated into Driven Brands on plan and has demonstrated improved performance by being a part of our platform rather than operating as an independent company.

80.     Driven highlighted that its bolt-on/tuck-in strategy allowed the Company to "immediately . . . absorb [] [acquired businesses] into [its] base business."

81.     Due to these repeated assurances, investors and analysts understood that the successful acquisition and integration of smaller businesses into Driven's operations was central to the Company's business model. Additionally, investors and analysts relied on the Individual Defendants' statements, touting the Company's experience and expertise in integrating smaller businesses, in evaluating Driven's business and prospects. For instance, analysts at Barclays emphasized "the consistency of [Driven's] model, . . . proven through comps, EBITDA growth, and M&A execution against a wide range of economic/macro backdrops," and stated that "M&A . . . should drive upside" for the Company.

***Driven's Auto Glass and Car Wash Business Segments***

82.     In October 2021, the Company announced a strategy to generate substantial revenue growth and bring EBITDA from just over $350 million to at least $850 million by 2026. The strategy involved acquiring a network of auto glass businesses across the country and driving sales and customer retention in the Company's purportedly stable car wash business. Analysts and investors credited the strategy for Driven's positive commercial prospects and echoed the Company's representations, with William Blair telling investors to "expect adjusted EBITDA to more than double over the next five years."

83.     In January 2022, Driven announced that it would be expanding into the "approximately $5 billion and growing" U.S. auto glass market. Pursuant to the Company's "bolt-on" strategy, Driven acquired AGN as its "base," representing to investors that it planned to

"leverage [its] growth blueprint" quickly to acquire "a robust pipeline" of smaller auto glass providers across the country, incorporating them into the Company's AGN "base" to "significantly accelerate [its] presence in this segment."

84.     Throughout the Relevant Period, the Individual Defendants represented that Driven's expansion into the auto glass market would fuel rapid growth. For instance, during an April 2022 earnings call, Defendant Fitzpatrick claimed that "our team is getting faster at executing the Driven Brands' playbook, and we think we'll have even more rapid progress in our glass business."

85.     Analysts reacted positively to the Individual Defendants' representations, with Morgan Stanley analysts reporting that Driven's expansion into the auto glass market was "a key growth driver in an attractive, fragmented $5bn industry."

86.     In addition to Driven's expansion into the auto glass industry, the Company's growth strategy involved its purportedly stable car wash segment contributing steady growth. The performance of Driven's car wash segment was critical to the Company's overall success. Indeed, at the start of the Relevant Period, Driven's car wash business accounted for more than 10% of its revenue and more than 30% of its earnings.

87.     The Individual Defendants attributed the purported success of Driven's car wash segment to two factors: (i) its expanding network of car wash locations, "with more than 900 locations across 14 countries"; and (ii) customer loyalty resulting from consistent service quality across locations and a subscription-based car wash program. For instance, the IPO Prospectus characterized the Company's car wash store count as a "key performance indicator" and emphasized that Driven's subscription model "foster[ed] strong customer loyalty to our stores" and "generate[d] predictable and recurring revenue."

88.     Despite the Individual Defendants' positive statements concerning the Company's auto glass and car wash business segments, both segments were suffering from significant issues that were impacting Driven's aggressive growth strategy.

89.     As early as May 2022, the Individual Defendants discovered serious issues with Driven's base auto glass platform, AGN, which caused substantial delays in the Company's integration timeline. Several former Driven employees, interviewed in the Securities Class Action, confirm that the Individual Defendants were aware of the serious and undisclosed issues impacting the Company's auto glass acquisitions and integrations. For instance, FE 1, a senior executive in Driven's auto glass business, stated that Driven discovered that its "proven M&A playbook" did not apply to the auto glass business. FE 1 explained that each glass business in Driven's acquisition pipeline operated under a different business model and involved different revenue streams.

90.     Driven maintained a centralized POS system to compile and store revenue data from each of its acquired companies. Establishing and maintaining a functional POS system, which Driven ran through the AGN platform, was critical for the successful integration of any new companies. According to FE 1, it was widely understood throughout the Company that any delay in establishing a functional POS system would delay the Company's integration timelines, and by May 2022, it was clear that there were severe issues with the POS system. FE 1 stated that, by no later than June 2022, the issues with AGN's POS system were so severe that a whole new system would need to be established, causing a delay of at least six months.

91.     FE 3, a Regional Sales Manager at AGN from June to September 2023, similarly stated that the outlets he oversaw had only achieved 30-50% integration by the end of his employment and that there were even more significant integration delays in other regions. According to FE 3, by June 2023, the POS integration was still unfinished.

92. Similarly, former Company employees revealed significant undisclosed issues with the Company's car wash segment. Specifically, the Company failed to adequately invest in service, equipment, and maintenance in its car was business segment, causing significant operational and service failures and contributing to substantial declines in same-store sales. Former employees confirmed that senior management, including Defendant Fitzpatrick, was frequently informed of the need for additional investment in car wash maintenance and service.

93. FE 4, a Vice President in Driven's car wash business segment from April 2022 until May 2023, recalled mechanical failures and maintenance issues that significantly impaired the car wash segment's operating capacity. FE 4 stated that Defendant Fitzpatrick received bi-monthly reports, which detailed the cuts in maintenance investment that were responsible for these issues.

94. FE 5, who worked in the Company's car wash segment from prior to the start of the Relevant Period until early 2022, similarly stated that the Company's service and maintenance issues were communicated directly to Defendant Fitzpatrick. For instance, FE 5 personally reported these issues to Defendant Fitzpatrick, explaining that 75% of Driven's car washes needed wholesale mechanical rebuilds. In response, Defendant Fitzpatrick stated, "wow, it sounds like we should have done better due diligence when we took over" Driven's car wash platform.

*False and Misleading Statements*

95. During an earnings call on October 27, 2021, Defendant Fitzpatrick stated that Driven was "committed to having the best stores" and "to offer[ing] customers the best experience" in the car wash business, emphasizing that the Company's car wash brand "stands for . . . quality."

96. These statements were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) the car wash business segment was suffering from widespread equipment failures and poor

service; (ii) the Company failed to adequately invest in service, equipment, and maintenance in its car wash business, which significantly impaired the segment's operating capacity; and (iii) as a result of the foregoing, the car wash business segment was experiencing substantial customer loss, competitive intrusion, and declining same-store sales.

97.     On November 1, 2021, Driven issued a press release, which touted that the Company maintained "over 300" car washes in the U.S. and was "the fastest-growing express conveyor car was operator in North America."

98.     These statements, touting the operating capacity of Driven's car wash segment, were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) the car wash business segment was suffering from widespread equipment failures and poor service; (ii) the Company failed to adequately invest in service, equipment, and maintenance in its car wash business, which significantly impaired the segment's operating capacity; and (iii) as a result of the foregoing, the car wash business segment was experiencing substantial customer loss, competitive intrusion, and declining same-store sales.

99.     During an earnings call on February 16, 2022, an analyst asked a question concerning investments to upgrade car wash equipment to attract new customers. In response, Defendant Fitzpatrick claimed that Driven was "continuing to invest into the existing asset base as well specifically to upgrade equipment, to add maybe incremental components to that equipment package, which then helps driving incremental new customers."

100.     These statements, highlighting the Company's purported investments in equipment for its car wash segment, were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) the

car wash business segment was suffering from widespread equipment failures and poor service; (ii) the Company failed to adequately invest in service, equipment, and maintenance in its car wash business, which significantly impaired the segment's operating capacity; and (iii) as a result of the foregoing, the car wash business segment was experiencing substantial customer loss, competitive intrusion, and declining same-store sales.

101.    On April 8, 2022, Driven filed a proxy statement of Form DEF 14A with the SEC (the "2022 Proxy"), soliciting shareholder approval for, *inter alia*, the election of Defendants Halligan, Puckett, and Thompson to the Board and the compensation of certain of the Company's executive officers, including Defendants Fitzpatrick and Mason.

102.    With respect to the Company's risk oversight function, the 2022 Proxy stated:

> The Board of Directors executes its risk oversight responsibilities through active review and discussion of key risks facing the Company and by delegating certain risk oversight responsibilities to its committees, who regularly report back to the Board of Directors. For example, the Compensation Committee of our Board of Directors is responsible for overseeing the management of risks relating to the Company's compensation plans and arrangements and the Audit Committee of our Board of Directors oversees the management of financial risks, including accounting and financial reporting processes, internal controls and internal audit functions, the fraud risk assessment program, the enterprise risk management program, and other risk exposures, including data privacy and cybersecurity. Although the committees are responsible for evaluating and overseeing the management of their respective risks, they regularly report to the Board of Directors regarding such risks.

103.    With respect to the Company's internal controls, the 2022 Proxy stated that the "principal duties and responsibilities of our Audit Committee" include "to oversee and monitor the integrity of our financial statements and internal control system."

104.    The 2022 Proxy was materially misleading because it failed to disclose the serious issues with the Company's car wash and auto glass business segments. Further, despite descriptions of the Board's and its committees' oversight responsibilities with respect to risk

management and internal controls, the Board and its committees were not adequately fulfilling these responsibilities and were causing or permitting the Company to issue false and misleading statements.

105.     During an earnings call on April 27, 2022, Defendant Fitzpatrick claimed that Driven had "made significant progress" in its glass strategy, adding that he was "very pleased with [Driven's] progress over the first 90 days." Defendant Fitzpatrick further represented that the Company was "making good progress with Driven's existing . . . insurance partners and introducing them to our glass capabilities." Defendant Mason similarly claimed that Driven's "proven M&A playbook" was "delivering" in its "glass businesses."

106.     These statements were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) the Company failed to establish and maintain an effective POS system to report and store data across the Company's auto glass segment; (ii) these data issues caused substantial delays in the Company's integration timeline; (iii) the Company would be forced to undergo a complete overhaul of AGN's POS system; (iv) as a result of these issues, several of Driven's acquired businesses could not effectively communicate with the AGN platform; (v) this adversely impacted Driven's ability to service key customers; and (vi) as a result of the foregoing, the Company's revenue growth was stifled by customer loss and integration delays in its auto glass business segment.

107.     On May 25, 2022, Driven issued a press release which touted that the Company was "continu[ing] its growth trajectory" and had "celebrated another significant milestone – opening its 350th express car wash."

108.     These statements, touting the operating capacity of Driven's car wash segment,

were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) the car wash business segment was suffering from widespread equipment failures and poor service; (ii) the Company failed to adequately invest in service, equipment, and maintenance in its car wash business, which significantly impaired the segment's operating capacity; and (iii) as a result of the foregoing, the car wash business segment was experiencing substantial customer loss, competitive intrusion, and declining same-store sales.

109.    During an earnings call on July 27, 2022 (the "July 27, 2022 Earnings Call"), Defendant Fitzpatrick maintained that he was "very pleased with our progress in glass over the first 180 days" and again stated that Driven was "making good progress with Driven's existing . . . insurance partners and introducing them to our glass capabilities." Defendant Mason reiterated during the call that the Company's "proven M&A playbook" was "delivering" in its "glass businesses."

110.    These statements were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) the Company failed to establish and maintain an effective POS system to report and store data across the Company's auto glass segment; (ii) these data issues caused substantial delays in the Company's integration timeline; (iii) the Company would be forced to undergo a complete overhaul of AGN's POS system; (iv) as a result of these issues, several of Driven's acquired businesses could not effectively communicate with the AGN platform; (v) this adversely impacted Driven's ability to service key customers; and (vi) as a result of the foregoing, the Company's revenue growth was stifled by customer loss and integration delays in its auto glass business segment.

111.     Also during the July 27, 2022 Earnings Call, Defendant Fitzpatrick was questioned with respect to changes in customer satisfaction at Driven's car washes as a result of being integrated into the Company's Take 5 platform. In response, Defendant Fitzpatrick stated that "the experience for the customer is significantly better pre and post . . . rebranding," including because "any deferred maintenance that was there is done, so the equipment is working beautifully."

112.     These statements were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) the car wash business segment was suffering from widespread equipment failures and poor service; (ii) the Company failed to adequately invest in service, equipment, and maintenance in its car wash business, which significantly impaired the segment's operating capacity; and (iii) as a result of the foregoing, the car wash business segment was experiencing substantial customer loss, competitive intrusion, and declining same-store sales.

113.     On September 7, 2022, Defendant Fitzpatrick spoke at the Goldman Sachs Global Retailing Conference on behalf of Driven. During the conference, Defendant Fitzpatrick highlighted the Company's subscription-based car wash service, stating that "it creates stickiness with the consumer, stickiness with the cash flows, predictability."

114.     These statements were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) the car wash business segment was suffering from widespread equipment failures and poor service; (ii) the Company failed to adequately invest in service, equipment, and maintenance in its car wash business, which significantly impaired the segment's operating capacity; and (iii) as a result of the foregoing, the car wash business segment was experiencing substantial customer loss, competitive intrusion, and declining same-store sales.

***The Truth Gradually Emerges as the Individual Defendants Continue to Issue Materially False and Misleading Statements***

115.    On October 26, 2022, Driven issued an earnings release and hosted an earnings call (the "October 26, 2022 Earnings Call"), announcing its financial results for the third quarter of 2022. During the October 26, 2022 Earnings Call, Defendant Fitzpatrick reported that the auto glass business was significantly delayed in its ability to service insurers and would be unable to do so until "late 2023 and 2024." Analysts reacted negatively to the disclosure, with one analyst noting that "a lot of investors are eager for you to open up that insurance opportunity" because it would "probably double the TAM [total addressable market]." With respect to the Company's car wash business segment, Driven further disclosed that same-store sales had declined 3.4% year-over-year even ignoring foreign exchange issues.

116.    On October 26, 2022, Goldman Sachs reported that the delays in the auto glass business segment's ability to service insurers "may have surprised some investors that expected insurance growth within the business sooner." Indeed, on this news, the price of Driven stock declined more than 7%, from a close of $32.37 per share on October 25, 2022 to close at $29.96 per share on October 26, 2022.

117.    Despite this partially corrective disclosure, the price of Driven stock remained artificially inflated as the Individual Defendants continued to conceal the truth and issue materially false and misleading statements.

118.    For instance, during the October 26, 2022 Earnings Call, Defendant Mason continued to tout the car wash segment's "sticky" revenue and customer retention, stating that Driven "continue[d] to grow our Wash Club program" which was "not only a great recurring revenue stream that provides a level of predictability to this business, but it is also proving to be a sticky customer." Further, Defendant Fitzpatrick attributed struggles in the car wash segment to

macroeconomic factors, stating that Driven "did experience some headwinds in the third quarter related to . . . softening retail volume as the result of the macro environment." With respect to Driven's auto glass segment, Defendant Fitzpatrick stated that the Company "continued to make significant progress across our key growth levers [including] glass, leveraging our proven playbook."

119.    On December 6, 2022, Defendant Fitzpatrick spoke at the Morgan Stanley Global Consumer Conference on behalf of the Company. During the Conference, Defendant Fitzpatrick claimed that competition was merely "a small piece" of the "weakness" in Driven's car wash segment.

120.    On February 22, 2023, Driven reported negative same-store sales growth in the car wash segment. During an earnings call, hosted by the Company on the same day, Defendant Fitzpatrick attributed Driven's poor car wash results to "softer retail volume, as a result of the macroeconomic environment." Defendant Fitzgerald additionally attempted to assuage investor concern related to Driven's car wash segment, claiming that the Company's "scale and experience will remain a significant competitive advantage," touting Driven's "significant network benefits that deepen our competitive moat and differentiate our business." Defendant Mason added that the Company "continued to . . . grow our subscription [car wash] program," which was "a great recurring revenue stream that provides a level of predictability to this business" and was "also proving to be a sticky customer and an important focus for Driven Brands." With respect to Driven's auto glass business segment, Defendant Fitzpatrick stated that the construction of the glass platform itself was complete, stating that Driven "did a phenomenal job in 2022 building out that platform from zero to becoming the second largest player in the United States."

121.    On March 29, 2023, Driven issued a press release, which touted the operating

capacity of the Company's car wash business segment, highlighting that Driven had "more than doubled its total footprint since Driven Brands entered in the car wash business in August 2020" and had "celebrated the grand opening of its 400th car wash."

122.     The same day, Driven filed a proxy statement on Form DEF 14A with the SEC (the "2023 Proxy"), soliciting shareholder approval for, *inter alia*, the election of Defendants Hume, Stroup, and Swinburn to the Board and the compensation of certain of the Company's executive officers, including Defendants Fitzpatrick and Mason.

123.     With respect to the Company's internal controls, the 2023 Proxy stated that the "principal duties and responsibilities of our Audit Committee" include "to oversee and monitor the integrity of our financial statements and internal control system."

124.     On May 3, 2023, after again reporting negative same-store sales growth in its car wash business segment, Driven hosted an earnings call (the "May 3, 2023 Earnings Call"). During the May 3, 2023 Earnings Call, Defendant Fitzpatrick attributed the poor results to "softer retail volume as a result of the macro environment," assuring investors that the Company's "scale and experience will remain a significant competitive advantage as the current environment is beginning to rationalize the competitive intensity of new entrants." Defendant Masons similarly stated that "retail volume was soft again this quarter as a result of the macroeconomic environment and poor weather condition." Defendant Mason repeated this sentiment throughout the May 3, 2023 Earnings Call, stating that "[w]e attribute the softness over the last few quarters to both the macroeconomic environment and then this quarter, in particular, to poor weather conditions in . . . the U.S."; "we've seen macroeconomic pressure specifically in the car wash business since about Q2 of last year" in the U.S.; and "in Q1, it's probably equal parts, continued macroeconomic pressure, and then . . . the poor weather conditions."

125.    With respect to Driven's auto glass business, Defendant Fitzpatrick stated that the Company had "made significant progress integrating our 10 acquisitions" during the first quarter and had "combined the best processes, procedures, and technology to inform our standard operating model that has been rolled out across the entire footprint." Defendant Mason similarly stated that Driven was "currently integrating our series of acquisitions under the Auto Glass Now brand name and implementing our new standard operating procedures" and that "we expect glass margins to expand from here as we integrate the business."

126.    While the truth was partially revealed between October 2022 and May 2023, the Individual Defendants' statements, identified above, continued to conceal the extent of the Company's issues. Specifically, the statements identified above failed to disclose that: (i) the car wash business segment was suffering from widespread equipment failures and poor service; (ii) the Company failed to adequately invest in service, equipment, and maintenance in its car wash business, which significantly impaired the segment's operating capacity; and (iii) as a result of the foregoing, the car wash business segment was experiencing substantial customer loss, competitive intrusion, and declining same-store sales. Further, with respect to the Company's auto glass business segment, the Individual Defendants failed to disclose that: (i) the Company failed to establish and maintain an effective POS system to report and store data across the Company's auto glass segment; (ii) these data issues caused substantial delays in the Company's integration timeline; (iii) the Company would be forced to undergo a complete overhaul of AGN's POS system; (iv) as a result of these issues, several of Driven's acquired businesses could not effectively communicate with the AGN platform; (v) this adversely impacted Driven's ability to service key customers; and (vi) as a result of the foregoing, the Company's revenue growth was stifled by customer loss and integration delays in its auto glass business segment.

*The Truth Fully Emerges*

127.     On May 8, 2023, the Company announced that it had terminated Defendant Mason as CFO on May 4, just one day after reporting its first quarter 2023 financial results. The Company reaffirmed its 2023 guidance issued on May 3 and announced that Gary Ferrara would replace Defendant Mason as CFO effective May 10, 2023. Driven additionally announced that it would be postponing its investor day conference until September 2023 "due to the Company's recent CFO transition."

128.     Then, during an earnings call on August 2, 2023, the Company revealed that its integrations in the auto glass business segment were "several quarters behind" and were "not going as quickly as planned." As a result, in order to "get the integration completed," the Company would substantially decrease the scope of its glass acquisition campaign and reduce its new glass unit store growth for 2023 from 130 to 90.

129.     With respect to the Company's car wash business segment, Driven announced a 4% year-over-year same-store sales decline, attributable to "significant competitive . . . growth" over the prior two years and admitting that Driven was losing substantial numbers of customers to these competitors. As a result of the issues with Driven's car wash and auto glass business segments, the Company reduced its 2023 EPS guidance by 24%, despite reaffirming its guidance just two months earlier.

130.     When questioned regarding why the Company was only just disclosing that it was "several quarters behind" with respect to its glass segment, given that the issues had likely been "emerging" for some time, Defendant Fitzpatrick admitted that there had been no significant external developments that changed the outlook for either business segment. Instead, with access to the same facts and information available to the Individual Defendants during the Relevant

Period, Driven's new CFO ascertained in less than two months that the Individual Defendants' statements identified herein were inaccurate. Specifically, Defendant Fitzpatrick explained that Defendant Mason's termination "60-or-so days ago" had provided "a chance for Gary with a fresh set of eyes to look at the business, to look at the assumptions" and conclude that "we're probably a little bit behind where we want to be." With respect to Driven's car wash business, the Individual Defendants acknowledged that the competitive intrusion had been building over "the last two years."

131. On this news, the price of Driven stock declined roughly 41%, from a close of $25.83 per share on August 1, 2023 to close at $15.20 per share on August 2, 2023.

***Post-Relevant Period Events***

132. On September 20, 2023, Driven hosted its investor day event. During the event, Defendant Fitzpatrick again acknowledged that the auto glass integration delays had been caused by factors known to the Individual Defendants during the Relevant Period, including the fact that Driven had "[taken] on a lot of integration involving 1,000 employees, multiple businesses and multiple operating models," which "was a lot." Defendant Fitzpatrick admitted that the Company "should have gone slower" and explained that Driven would pause adding new units to its auto glass platform until 2025 in order to focus on integration. With respect to the Company's car wash business segment, Defendant Fitzpatrick conceded that its "performance is not acceptable," explaining that Driven had to "fix it or think differently about the long-term."

133. During an earnings call on November 1, 2023, Driven's Chief Operating Officer ("COO") disclosed that the "integration challenges have resulted in underperformance of our US glass business in 2023." Driven's COO additionally stated that the Company had only just completed AGN's POS system and that the Company did not expect to complete integration until

the first quarter of 2024. With respect to the Company's car wash segment, Driven announced a massive $851 million write-down after "assessing underperforming stores and their local competitive environment," which constituted more than 10% of the Company's entire asset value as of the end of 2022. The Company additionally announced that it would close dozens of stores and would pause opening new ones.

***Insider Sales***

134. During the Relevant Period, Defendant Aronson sold Company stock while in possession of material non-public information concerning the Company's financial condition and business prospects. Defendant Aronson made these sales while the price of Driven stock was artificially inflated due to the Individual Defendants' false and misleading statements detailed herein.

135. Defendant Aronson reaped hundreds of millions of dollars in profits selling personal holdings of Company stock at an average price of $32.19, more than 200% of the stock's closing price of $15.20 per share after the corrective disclosures on August 2, 2023.

***The Securities Class Action***

136. As a result of the Individual Defendants' misconduct, the Securities Class Action was filed against the Company and Defendants Fitzpatrick and Mason on December 22, 2023. The plaintiffs in the Securities Class Action filed an amended complaint on August 13, 2024. Case No. 3:23-cv-00895-MOC-DCK, ECF No. 31.

137. On October 14, 2024, the defendants in the Securities Class Action filed a motion to dismiss the amended complaint. *Id*., ECF No. 37.

138. On February 20, 2025, the Court in the Securities Class Action entered an order, holding that the amended complaint "state[d] a plausible claim for relief" and denying the motion

to dismiss. *Id.*, ECF No. 45 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

## DAMAGE TO THE COMPANY

139.    As a direct and proximate result of the misconduct detailed above, the Company has incurred and will continue to incur significant financial losses, including but not limited to, the costs of defending against and incurring potential class-wide liability in the Securities Class Action.

140.    These damages also include the costs of remediating deficiencies in the Company's procedures and controls, compensation and benefits paid to current and former members of the Board and Company executives, who breached their fiduciary duties to Driven, and reputational harm and the loss of goodwill.

141.    Furthermore, as a direct and proximate result of the misconduct detailed herein, Driven has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

142.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties and other violations of law.

143.    Driven is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

144.    Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

145. Plaintiff is an owner of Driven stock and has been a continuous holder of the Company's common shares at all relevant times.

146. At the time this action was commenced, the ten-member Board was comprised of Defendants Aronson, Fitzpatrick, Halligan, Hume, Puckett, Stroup, Swinburn, Thompson, and Tomás, along with Damien Harmon, who joined the Board in January 2024 and is not a party to this action. Accordingly, Plaintiff is only required to show that five directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, at least nine of the Board's current directors are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

147. The Individual Defendants, together and individually, violated and breached their fiduciary duties of candor, good faith, and loyalty. Specifically, the Individual Defendants knowingly approved and/or permitted the wrongs alleged herein and participated in efforts to conceal those wrongs. The Individual Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized, and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein. Accordingly, the Individual Defendants could not fairly and fully prosecute such a suit even if they instituted it.

148. The Individual Defendants either knowingly or recklessly issued or caused the Company to issue the materially false and misleading statements alleged herein. The Individual Defendants knew of the falsity of the misleading statements at the time they were made. As a result of the foregoing, the Individual Defendants breached their fiduciary duties, face a substantial

likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

149. As members of the Board charged with overseeing the Company's affairs, each of the Individual Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of Driven, the Individual Defendants knew, or should have known, the material facts surrounding Driven's underinvestment in equipment and maintenance in its car wash business segment and the integration issues in the Company's auto glass business segment.

150. Defendant Fitzpatrick is not disinterested or independent because he has served as the Company's CEO and President from July 2012 until May 9, 2025. Further, Defendant Fitzpatrick is not disinterested or independent because he is named as a defendant, and faces significant personal liability, in the Securities Class Action based on substantially the same wrongdoing as alleged herein, specifically issuing materially false and misleading statements during the Relevant Period.

151. Defendants Aronson, Hume, and Thompson are each affiliated with Roark Capital Management, LLC ("Roark"), the Company's largest shareholder. Specifically, as of April 7, 2025, Roark owns 101,591,523 shares of Driven stock, worth roughly $1.6 billion and constituting 61.8% of the Company's total outstanding stock. Accordingly, in addition to Defendant Fitzpatrick, due to his service as Driven's CEO, the Company admits that Defendants Hume, Aronson, and Thompson are non-independent directors pursuant to the requirements set forth by NASDAQ.

152. Defendants Puckett, Stroup, and Swinburn serve as members of the Audit Committee and, pursuant to the Charter, were specifically charged with the responsibility of

assisting the Board in fulfilling its oversight responsibilities related to the adequacy of the Company's internal controls over financial reporting and public disclosure requirements. Throughout the Relevant Period, however, these Defendants breached their fiduciary duties to the Company by failing to prevent and/or correct the issuance of material misstatements and omissions regarding the Company's carwash and auto glass business segments as alleged above. Therefore, Defendants Puckett, Stroup, and Swinburn cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihood.

153. Additionally, each of the directors received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company. Indeed, all of the Individual Defendants benefitted directly from the wrongdoing alleged herein. Specifically, the Individual Defendants benefitted from the artificial inflation of the price of the Company's stock and the resulting increase in the value of Driven stock and stock options they held.

154. The Individual Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Individual Defendants to also adhere to Driven's standards of business conduct. The Individual Defendants violated the Code of Conduct because they knowingly or recklessly engaged in and participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Individual Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

155. Furthermore, demand in this case is excused because each of the directors derive

substantial revenue from the Company, control the company, and are indebted to each other. These conflicts of interest have precluded the current directors from adequately monitoring the Company's operations and internal controls and calling into question the other Individual Defendants' conduct. Significantly, none of the Board's current members have taken remedial action to redress the conduct alleged herein. For instance, none of the Board's current members have sought to enforce the Company's Clawback Policy.

156. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

157. The acts complained of herein constitute violations of fiduciary duties owed by Driven's officers and directors, and these acts are incapable of ratification.

158. The Individual Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Driven. If there is a directors' and officers' liability insurance policy covering the Individual Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Individual Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the

Individual Defendants were to sue themselves or certain officers of Driven, there would be no directors' and officers' insurance protection. Accordingly, the Individual Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Individual Defendants is futile and, therefore, excused.

159. If there is no directors' and officers' liability insurance, then the Individual Defendants will not cause Driven to sue the Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

160. Accordingly, for all of the reasons set forth above, at least nine of the Company's current directors cannot consider a demand with disinterestedness and independence. Consequently, a pre-suit demand on the Board is futile and excused.

## **COUNT I**

### **Against the Individual Defendants for Breach of Fiduciary Duties**

161. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

162. The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

163. The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

164. The Individual Defendants engaged in a sustained and systematic failure to properly

exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

165.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

166.    Plaintiff, on behalf of Driven, has no adequate remedy at law.

### COUNT II

**Against Defendant Aronson**
**For Breach of Fiduciary Duties (*Brophy* Claim)**

167.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

168.    During the Relevant Period, Defendant Aronson held a position with the Company that provided him access to confidential, proprietary information concerning the Company's financial condition and future business prospects. Notwithstanding his duty to refrain from trading

in Driven common stock under the circumstances, Defendant Aronson sold his holdings in the Company at artificially inflated prices prior to the disclosure of the true state of the Company's finances and future prospects.

169. The insider sales detailed herein, were not part of any regular pattern of sales for Defendant Aronson and were suspicious in terms of timing and amount.

170. The information at issue was proprietary, non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which Defendant Aronson misappropriated to his own benefit when he sold Driven stock. At the time of his stock sales, Defendant Aronson was aware that the Company's business and prospects were declining, which when disclosed to the market would cause the inflated price of the Company's common stock to significantly decrease. Defendant Aronson's sales of stock while in possession and control of this material, adverse, non-public information was a breach of his fiduciary duties of loyalty and good faith.

171. Plaintiff, on behalf of Driven, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Aiding and
### Abetting Breach of Fiduciary Duty

172. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

173. By encouraging and accomplishing the illegal and improper actions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained

of herein.

174.    Plaintiff, on behalf of Driven, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for
### Unjust Enrichment

175.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

176.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Driven.

177.    The Individual Defendants were unjustly enriched by their receipt of bonuses, stock options, or similar compensation from Driven that was tied to their performance or to the artificially inflated valuation of Driven.

178.    Defendant Aronson was further unjustly enriched with respect to insider sales of Company stock.

179.    Plaintiff, as a stockholder and representative of the Company, seeks restitution from the Individual Defendants, and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants as a result of their wrongful conduct and fiduciary breaches.

180.    As a direct and proximate result of the Individual Defendants' misconduct, the Company has suffered significant damages, as alleged herein.

181.    Plaintiff, on behalf of Driven, has no adequate remedy at law.

## COUNT V

### Against the Individual Defendants
### for Waste of Corporate Assets

182.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

183.    The Individual Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of Driven's internal controls, by issuing, causing the issuance of, and/or failing to correct the false and misleading statements identified herein, and by allowing the Company to engage in an illegal, unethical, and improper course of conduct, which was continuous, connected, and ongoing at all relevant times.

184.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, among other things, incurring and paying defense costs in connection with the Securities Class Action, and approving performance-based compensation linked to the Company's perceived successes.

185.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

186.    Plaintiff on behalf Driven has no adequate remedy at law.

<u>**COUNT VI**</u>

**Against Defendants Fitzpatrick and Mason for Contribution Under
Section 10(b) and 21D of the Securities Exchange Act of 1934**

187.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

188.    Driven, along with Defendants Fitzpatrick and Mason (the "Officer Defendants"), are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.

189.    The Securities Class Action alleges that the class members relied, directly or

indirectly, upon the false and misleading statements and omissions, as alleged herein, in purchasing Driven securities. The Securities Class Action further alleges that, as a direct and proximate result, the class members suffered damages because the value of their investments were artificially inflated by the false and misleading statements and omissions, they purchased such securities at the artificially inflated prices, and the value of their investments fell when the truth was eventually revealed, causing economic losses to the class members.

190.    If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to the Officer Defendants' willful and/or reckless violations of their obligations as officers and/or directors of the Company.

191.    The Officer Defendants, because of their positions of control and authority as senior executive officers of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

192.    Accordingly, the Officer Defendants are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

193.    As such, the Company is entitled to receive all appropriate contribution or indemnification from the Officer Defendants.

## COUNT VII

**Against the Individual Defendants for Violations of § 14(a)**
**of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a-9 (17 C.F.R.§240.14a-9)**

194.    Plaintiff incorporates by reference and realleges each and every allegation

contained above, as though fully set forth herein.

195.   The Individual Defendants violated § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

196.   The Individual Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2022 Proxy and the 2023 Proxy filed with the SEC. As alleged above, these filings contained materially false and misleading statements concerning the adequacy of the Company's risk oversight function and its internal controls over financial reporting.

197.   The 2022 Proxy was used to solicit shareholder votes in connection with the election of Defendants Halligan, Puckett, and Thompson to the Company's Board. The 2023 Proxy was used to solicit shareholder votes in connection with the election of Defendants Hume, Stroup, and Swinburn.

198.   In addition, the 2022 Proxy and the 2023 Proxy were used to solicit the advisory vote to approve the compensation of, *inter alia*, Defendants Fitzpatrick and Mason. While the shareholder votes were non-binding, the 2022 Proxy and 2023 Proxy indicated that "the Compensation Committee and Board of Directors values the opinions of our stockholders and will consider the results of the vote in determining the compensation of the NEOs and the Company's compensation programs generally."

199.   With respect to the Company's "Executive Compensation Philosophy," the 2022 Proxy and the 2023 Proxy both indicate that executive compensation is performance-based. For instance, the 2022 Proxy states that "[c]ompensation opportunities are designed to align executives' pay with our performance and are focused on producing sustainable long-term growth.

200.   The materially false and misleading statements regarding the Company's risk

oversight function and internal controls therefore misleadingly induced shareholders to vote in favor of the election of certain of the Individual Defendants to the Board, and performance-based compensation to Defendants Fitzpatrick and Mason, to which they were not entitled.

201. The payment of unwarranted performance-based compensation to these Company executives was a waste of corporate assets.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A. Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B. Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C. Awarding punitive damages;

D. Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: April 30, 2025

Respectfully submitted,

**HAUSLER LAW FIRM, PLLC**

/s/ *Kurt F. Hausler*
Kurt F. Hausler
NC Bar No. 22103
524 East Boulevard
Charlotte, NC 28203
Telephone: (704) 247-3255
Fax: (704) 247-3267
Email: khausler@hauslerlaw.com

*Attorneys for Plaintiff*

**OF COUNSEL:**

**RIGRODSKY LAW, P.A.**
Timothy J. MacFall
Samir Aougab
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Telephone: (516) 683.3516
Facsimile: (302) 654-7530
Email: tjm@rl-legal.com
Email: sa@rl-legal.com

**GRABAR LAW OFFICES**
Joshua H. Grabar
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Tel:  267-507-6085
Email: jgrabar@grabarlaw.com

## <u>VERIFICATION OF JONATHAN GAIMAN</u>

I, Jonathan Gaiman, am a plaintiff in this action. I have reviewed the allegations made in the Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. As to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: _____4/29/2025_____

_____
Jonathan Gaiman